# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-81606-CIV-ALTMAN/Reinhart

**JEFFREY PASS**,

    *Plaintiff*,

v.

**PRINCIPAL LIFE INSURANCE CO.**,

    *Defendant*.

_____/

## ORDER

Our Plaintiff, Dr. Jeffrey Pass (a dentist), was listed as the insured on his partner's disability policies—issued by the Defendant, Principal Life Insurance Company. The policies provided that, if Pass were to become disabled such that he could no longer practice dentistry, Principal would fund his partner's buy-out of his stake in the firm. When Pass suffered a total disability, his partner (Dr. Frydman) bought him out. The purchase agreement stipulated that Frydman would pay *only* for Pass's share of the dental practice—as determined by their joint accountant. The agreement also provided that, if Frydman could max out his insurance policies—through litigation or otherwise—he would add any additional insurance proceeds to Pass's pay-out. If no such additional funds became available, however, Frydman wouldn't have to pay Pass any amount above the appraised value. Pass, as assignee of Frydman's rights under the policies, has now sued Principal for the difference between the appraisal price and the policies' maximum coverage.[1]

---

[1] For reasons having to do with a third disability policy issued by a non-party, the calculation is actually a bit more complicated than we've made it seem in this introduction. But we'll get into all that in a moment.

Because the insurance policies—and the underlying shareholder agreement to which they refer—didn't permit Pass and Frydman to max out their policies arbitrarily (as they've attempted to do here), we **GRANT** Principal's Renewed Motion for Judgment on the Pleadings [ECF No. 27].

## BACKGROUND[2]

Drs. Pass and Frydman owned a dental practice in Broward County, Florida. *See* Amended Complaint ¶ 6. Frydman was originally an associate, but he became a co-owner in 2001 under a "Buy-Sell Agreement,"[3] which governed the dentists' ownership and management of their firm. *Id.* As relevant here, the Buy-Sell Agreement required each of Pass and Frydman to take out a "disability buy-out insurance" policy on the other—the purpose of which was to fund the buy-out of the counterpart's share of the firm if that counterpart became permanently disabled and could no longer work. *Id.* ¶ 8; *see also* Buy-Sell Agreement ¶¶ 9A, C.

The Buy-Sell Agreement set out the method for computing the purchase price of the co-owner's share of the firm as follows: "The purchase price for the SHARES of a DISABLED SHAREHOLDER shall be the price which would have been paid had he died on the first day of the onset of the disability." Buy-Sell Agreement ¶ 9D. To calculate that price, the Buy-Sell Agreement required Pass and Frydman, first, to add up the firm's cash receipts from the previous two years and, second, to multiply and divide the total sum by four variables. *Id.* ¶ 9B(1)–(4). The Buy-Sell Agreement mandated that the firm's accountant complete this valuation. *Id.* ¶ 9B(5). This computational method

---

[2] We take the following facts from the Amended Complaint [ECF No. 21] and the appended exhibits, which include (1) the Buy-Sell Agreement [ECF No. 21-1]; (2) Policy 7490872 ("Policy 1") [ECF No. 21-2] and Policy 7548912 ("Policy 2") [ECF No. 21-3], which we refer to collectively as "the Policies"; (3) the Closing Agreement [ECF No. 21-4]; (4) the Promissory Note [ECF No. 21-5]; and (6) the Claims Decision [ECF No. 21-6]. At one point, we refer to the updated versions of Policy 1 and Policy 2 from 2015, which were attached to Principal's Answer [ECF No. 26]. These versions are the same as the original Policies—except that they reflect certain increases to the coverage amounts. *See* Updated Policy 1 [ECF No. 26-1]; Updated Policy 2 [ECF No. 26-2].

[3] The ownership contract is titled the "Shareholder's Agreement," but both parties refer to it as the Buy-Sell Agreement because, as we shall see, that is what it's called in the Policies.

2

was identical to the process that would be used to determine the purchase price of a co-owner's shares upon his *retirement*. *Id.* ¶ 10B ("The total sum to be paid to a RETIRED SHAREHOLDER shall be the amount that would have been paid had he died on the effective date of his retirement.").

The Buy-Sell Agreement also included a provision that addressed situations in which the disability proceeds were either less than or greater than the purchase price of the disabled co-owner's share of the firm (as computed above). Here's that provision:

> If the Purchase Price is in excess of the Disability Purchase Policy proceeds, the REMAINING SHAREHOLDER shall pay the excess purchase price by the execution and delivery of a Promissory Note . . . .
>
> If the insurance proceeds are in excess of the purchase price, computed in accordance with the provisions hereof, the purchase price shall be conclusively deemed to have been increased to the amount of the insurance proceeds, which shall be paid in their entirety as payment for the purchase price of the DISABLED SHAREHOLDER'S SHARES.

*Id.* ¶ 9D. In other words, the Buy-Sell Agreement ensured that the purchase price would be the higher of (1) the accountant's valuation of the disabled co-owner's stake in the firm based on the calculation outlined above, and (2) the disability insurance "proceeds."

Pursuant to the Buy-Sell Agreement, Frydman purchased two policies from Principal—both of which listed Pass as the insured. *See* Amended Complaint ¶ 8.[4] The Policies obliged Principal to reimburse Frydman's "Buy-Out Expense" if four conditions occurred: (1) the insured (Pass) suffered a total disability; (2) Pass had an ownership interest in the firm when the owner (Frydman) incurred the Buy-Out Expense; (3) "[Frydman] incur[red] a Buy-Out Expense in performance of the terms of the Buy-Sell Agreement that [was] in force at the time the Total Disability beg[an]"; and (4) Frydman

---

[4] Frydman also purchased a policy from Northwestern Mutual for additional coverage. *See* Closing Agreement ¶ 1(a) (referencing the Northwestern Mutual Policy); *see also* Claims Decision at 2.

sent Principal whatever information the Policies required him to provide. *See* Policy 1 at 5; Policy 2 at 6.

The Policies defined the "Buy-Out Expense" as "the expense incurred by the Owner in performance of the terms of the Buy-Sell Agreement in effect when the Insured's Total Disability began." Policy 1 at 4; Policy 2 at 4 (same). If the insured had buy-out coverage with another insurer (as was the case here), the Policies allowed Principal to deduct the amount of the additional coverage from the Buy-Out Expense it had to reimburse. As the Policies made clear: "The total benefits provided by this policy and any other Buy-Out Expense coverage in effect at the time of Total Disability will not exceed the total Buy-Out Expense incurred." Policy 1 at 5–6; Policy 2 at 6 (same).

As we noted above, one of the four conditions precedent to Principal's funding of the Buy-Out Expense was the requirement that Frydman provide certain information to Principal. *See* Policy 1 at 5; Policy 2 at 9. Policy 1 required Frydman to send Principal (1) the Buy-Sell Agreement that was in force at the time the total disability began, (2) the Buy-Out Expense Frydman "actually incur[red]," and (3) the method the accountant would use to value the firm. *See* Policy 1 at 6. Policy 2 mandated that Frydman give Principal a "satisfactory written proof of loss," which included "[c]opies of the Buy-Sell Agreement and business valuation documents and satisfactory evidence [that] Buy-Out Expense payments have been made," as well as other financial documents and any other proof Principal deemed necessary. Policy 2 at 6.

If the conditions precedent were met, the Policies directed Principal to pay Frydman in one of three ways: (1) monthly payments, (2) a lump sum, or (3) a combination of lump sum and monthly payments. *See* Policy 1 at 6; Policy 2 at 6–7. The lump sum would be "equal to the *lesser* of the actual lump sum Buy-Out Expense the Owner incurred *or* the Maximum Lump Sum Benefit shown on the current Data Page," *and* "[t]he total of the lump sum benefit will not exceed the lesser of the total Buy-Out Expense or the Maximum Aggregate Benefit." Policy 1 at 6 (emphases added); Policy 2 at 6

4

(same). The Maximum Lump Sum Benefit was defined as "the maximum lump sum amount payable for any Total Disability . . . shown on the current Data Page." Policy 1 at 4; Policy 2 at 4 (same). The Maximum Aggregate Benefit was the "the maximum amount payable for any Total Disability." Policy 1 at 4; Policy 2 at 4 (same).[5]

Pass eventually became permanently disabled. *See* Amended Complaint ¶ 14. To complete Frydman's purchase of Pass's share of the practice—and pursuant to the terms of the Buy-Sell Agreement—the two partners entered into a Closing Agreement. *Id.* ¶ 17. The Closing Agreement provided that Frydman would pay a purchase price of $880,400, composed of: (1) $255,000, to be reimbursed by Northwestern Mutual under its policy, (2) $455,000, to be reimbursed by Principal under both Policies, and (3) $200,400, to be reimbursed by Principal under Policy 2. *See* Closing Agreement ¶ 1(a)–(c). If the insurers refused to pay any of those amounts, the Closing Agreement stipulated that Frydman would assign his rights to Pass, who could then seek indemnification. *Id.* ¶ 1(d)(1). Whether or not Frydman (or Pass) could obtain the entire $880,400 from the insurers, though, Frydman would still pay Pass $524,623—the "guaranteed payment" Pass would have been entitled to upon his retirement, as provided in Paragraph 9 of the Buy-Sell Agreement. *Id.* ¶ 1(d)(2); *see also* Amended Complaint ¶ 18 (explaining that Pass would get the same amount "he would receive even if he retired").

If they *couldn't* collect disability insurance beyond $524,623, however, "then Dr. Frydman's tender under subparagraph (1) above shall be voided and Dr. Pass shall not collect any further payments from Dr. Frydman in excess of the Guaranteed Payments [of $524,623]." Closing

---

[5] Frydman selected the lump sum method for Policy 1, and the Maximum Aggregate Benefit (*i.e.*, the single lump sum payment) was $330,000. *See* Updated Policy 1 at 3. He chose the combination method for Policy 2, for which the Maximum Aggregate Benefit (*i.e.*, the one lump sum payment plus the subsequent monthly payments) equaled $325,400. *See* Updated Policy 2 at 3. The total Maximum Aggregate Benefit under the Policies was thus $655,400.

Agreement ¶ 1(d)(2). And, "[t]o the extent that any benefits under the Policies in excess of the Guaranteed Payments are paid to Dr. Frydman and/or Dr. Pass, such payments, once made to Dr. Pass, shall be allocated towards the Purchase Price." *Id.* The Closing Agreement also required Frydman to "execute a note" for the purchase price, and that note "shall be subject to paragraph 1(d) above such that payments in excess of $524,623 shall be suspended if any of the Policies do not pay benefits." *Id.* ¶ 2(b)(2).

In short, as the Amended Complaint and the appended documents make clear, using the calculation in Paragraph 9 of the Buy-Sell Agreement, Pass and Frydman's accountant determined that Pass's share of the firm was worth $524,623. *See* Closing Agreement ¶ 1(d)(2); Amended Complaint ¶ 18. But, because Frydman had a total of $880,400 in maximum policy coverage from *both* Northwestern Mutual and Principal, he and Pass purported to rely on Paragraph 9D of the Buy-Sell Agreement to bump their price up from $524,623 to $880,400. *See* Amended Complaint ¶ 20 (noting that the "purchase price [was] equivalent to the policies' *available* benefits" (emphasis added)). That higher price, though, was contingent on their collecting additional funds from the insurers. If they couldn't collect $880,400, then Frydman's obligation beyond $524,623 would be voided. Keep this last detail in mind because, try as Pass might to avoid it, it resolves the whole case.

In August 2017, Pass submitted the relevant claims documents to Principal and complied with the conditions precedent outlined in the Policies. *Id.* ¶ 19. Two years later, Principal paid out $299,623—which was, in Pass's view, only a portion of the benefits the insurer owed him. *Id.* ¶ 20. Pass believed that Frydman's total "Buy-Out Expense" under the Policies was $655,400—that is, $880,400 minus the $225,000 Northwestern Mutual had paid under its policy. *Id.* ¶ 15.[6] Accordingly,

---

[6] *See also* Policy 1 at 5–6 (noting that Principal could deduct the amount of any additional coverage from the total value of the Buy-Out Expense); Policy 2 at 6 (same); Claims Decision at 2 (showing that Northwestern Mutual had agreed to pay $225,000).

he contended that Principal still owed him $355,777 (*i.e.*, $655,400 minus $299,623). *See id.* ¶¶ 20, 22. Principal, for its part, maintained that it owed only $299,623, because that was the value of Pass's share of the firm ($524,623) minus the amount Northwestern Mutual had paid ($225,000). *See generally* Claims Decision.

Pass filed this lawsuit as an assignee of Frydman's rights under the Policies, alleging that Principal breached the Policies. *See* Amended Complaint ¶¶ 24, 25–32. Principal has since moved for judgment on the pleadings. *See* Defendant's Renewed Motion for Judgment on the Pleadings (the "Motion") [ECF No. 27]. And that Motion is now ripe for resolution. *See* Response in Opposition to Renewed Motion for Judgment on the Pleadings ("Response") [ECF No. 33]; Reply in Support of Renewed Motion for Judgment on the Pleadings ("Reply") [ECF No. 37].

## STANDARD OF REVIEW

Judgment on the pleadings is appropriate when there aren't any issues of material fact and the movant is entitled to judgment as a matter of law. *See Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014). "A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Rule 12(b)(6)." *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018). When ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept the complaint's factual allegations as true and must construe them in the light most favorable to the plaintiff. *See, e.g.*, *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 694 (11th Cir. 2016). To survive a motion to dismiss, the complaint's factual allegations "must be enough to raise a right to relief above the speculative level"—with "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). Under this standard, bare legal conclusions "are not entitled to the assumption of truth" and are insufficient, standing alone, to state a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Moreover, "[w]here a complaint pleads facts that are merely consistent

with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678 (internal quotation marks omitted).

A court may consider documents that are attached to a complaint when ruling on a motion for judgment on the pleadings. *See Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) (explaining that "documents attached to a complaint or incorporated in the complaint by reference can generally be considered by a federal district court in ruling on a motion to dismiss"); *see also* FED. R. CIV. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). "[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007); *see also Celestine v. Capital One*, 741 F. App'x 712, 713 (11th Cir. 2018) ("Where exhibits are submitted that contradict the alleged facts, the exhibits control, despite our construction of facts in favor of their truth.").

## ANALYSIS

Principal concedes that the four conditions precedent set out in the Policies were met and that Frydman (now Pass *qua* assignee) was entitled to his Buy-Out Expense. So, the only question left in our case is *how much* Principal was required to pay. *See* Motion at 2 ("The sole issue in this case is the proper calculation of the Buy-Out Expense benefits payable pursuant to the Policies."). In Principal's view, the Policies obligated it to reimburse *only* the actual "expense" Frydman "incurred" in buying out Pass's share of the firm. *See id.* at 13. That's why, for example, the Policies required Frydman to give proof of his expenses and the methodology his accountant used to appraise the firm—contractual obligations that would make little sense if Pass and Frydman had complete discretion to bind Principal with their own, different Buy-Out Expense. *See id.* According to Principal, then, the only "expense" Frydman "incurred" was the $524,623 he *guaranteed* to Pass. *See id.* at 14. Everything else—*i.e.*, any money above that amount—was voidable if the two partners couldn't collect more than $524,623 from their insurers. *Id.*

As Pass sees it, the Policies *didn't* tie the Buy-Out Expense to the market value of the firm; nor did they impose any other valuation method. *See* Response at 1–2. To the contrary, according to Pass, there weren't *any* limits—besides the maximum amount of insurance coverage—on the Buy-Out Expense. *Id.* at 2. And (Pass says) whatever price he and Frydman set as the Buy-Out Expense would then bind Principal—so long as that Buy-Out Expense didn't exceed the maximum amount of coverage, of course. *Id.* The co-owners thus relied on the Buy-Sell Agreement to set the purchase price at the level of total insurance coverage: $880,400. *Id.* After deducting the $225,000 contribution from Northwestern Mutual, the total Buy-Out Expense (Pass avers) became $655,400.

We disagree with Pass's reading of the relevant provisions. The Policies defined the "Buy-Out Expense" as "the expense *incurred* by the Owner in performance of the *terms of the Buy-Sell Agreement* in effect when the Insured's Total Disability began." Policy 1 at 4 (emphases added); Policy 2 at 4 (same). From this key definition, we draw two contractual requirements—*first*, that Frydman "incur"[7] the expenses and, *second*, that he incur those expense in performing the terms of the Buy-Sell Agreement.

Taking the second requirement first, Pass and Frydman were *not* complying with the terms of the Buy-Sell Agreement when they bumped up their purchase price to the maximum amount of disability *coverage*. The Buy-Sell Agreement allowed them to max out the price only at the amount of total insurance *proceeds*. *See* Buy-Sell Agreement ¶ 9D ("If the *insurance proceeds* are in excess of the purchase price, *computed in accordance with the provisions hereof*, the purchase price shall be conclusively deemed to have been increased to the amount of the *insurance proceeds*, which shall be paid in their

---

[7] The Policies almost always use the word "incur" when referring to the Buy-Out Expense. *See, e.g.*, Policy 1 at 5 ("The Buy-Out Expense benefit will become payable to the Owner the later of the end of the Elimination Period or the date *a Buy-Out Expense is incurred*." (emphasis added)); Policy 2 at 6 (same); Policy 1 at 6 ("We will require satisfactory proof of: . . . The Buy-Out Expense the Owner *actually incurs*" (emphasis added)); Policy 2 at 6 ("The monthly amount payable is equal to the lesser of the actual monthly Buy-Out Expense the Owner *incurred* or the Maximum Monthly Benefit shown on the current Data Page." (emphasis added)).

entirety as payment for the purchase price of the DISABLED SHAREHOLDER'S SHARES." (emphases added)). The "[p]roceeds," of course, are the funds Frydman actually *gains* or *obtains* from the Policies—not the maximum *coverage* that, on different facts and in different circumstances,[8] *might* have been available to him. *See* OXFORD ENGLISH DICTIONARY (2d ed. 1989) (defining a "proceed" as "that which is obtained or gained by any transaction; produce, outcome, profit"); *see also United States v. Santos,* 553 U.S. 507, 514 (2008) (holding that the term "proceeds" in the money laundering statute means "profits" rather than gross "receipts"); *United States v. Maali*, 358 F. Supp. 2d 1154, 1158 (M.D. Fla. 2005) (collecting pre-*Santos* cases that attempted to define the word "proceeds" as it appears in the money laundering statute and explaining that, "[w]hen reduced to their most basic elements, these definitions simply provide that 'proceeds' are something which is obtained in exchange for the sale of something else as in, most typically, when one sells a good in exchange for money"). And that makes sense: Paragraph 9D of the Buy-Sell Agreement reflected Pass and Frydman's contractual intention that the disabled shareholder—not the remaining shareholder—should receive the surplus insurance benefits. But, contra Pass's position, that provision isn't some special workaround meant to help Pass and Frydman max out on their insurance policies.

Despite the plain meaning of the words in the Policies, Pass argues that (1) "[t]he parties' intentions at the time of execution of the Buy-Sell Agreement was to ensure that the purchase price for a disabled shareholder's shares at the time of disability was equivalent *to the amount of disability buy-sell insurance at the time of disability*," and (2) it was "*also* the parties' intention that *upon receipt* of the insurance payments under the buy-sell policies in effect, the owner of the policies would pay the

---

[8] What might those different circumstances have looked like? We can think of two. On the one hand, the firm's accountant could have placed a value on Pass's share of the firm that exceeded the maximum coverage amount. In that scenario, of course, Pass would have been entitled to the maximum amount of coverage. On the other hand—as we discuss in note 9, *infra*—Frydman *could* have taken out a different kind of policy, one that paid Pass the maximum amount of coverage irrespective of the appraised value of Pass's share. But those aren't our facts.

disabled shareholder the benefits received from the policies." Amended Complaint ¶ 13 (emphases added). While we agree with the second premise, we reject the first as a post-hoc—and, we think, quite revisionist—reinterpretation of the Buy-Sell Agreement. Again, the Buy-Sell Agreement doesn't say anything about the "amount" of insurance "at the time" of disability; it simply allows a price adjustment when the insurance "proceeds" exceed the price that's computed under the contract. *See* Buy-Sell Agreement ¶ 9D. We therefore do not accept Pass's allegations to the extent it contradicts the plain text of the Buy-Sell Agreement—which, after all, Pass appended to the Amended Complaint. *See Celestine*, 741 F. App'x at 713 ("Where exhibits are submitted that contradict the alleged facts, the exhibits control, despite our construction of facts in favor of their truth."); *Hahamovitch v. Hahamovitch*, 174 So. 3d 983, 986 (Fla. 2015) ("Where a contract is clear and unambiguous, it must be enforced pursuant to its plain language. In such a situation, the language itself is the best evidence of the parties' intent, and its plain meaning controls."); *cf.* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.").

Trying to parry this conclusion, Pass contends that, if the purchase price is tied to the insurance proceeds, then Principal could always underpay with impunity. *See* Response at 15–16 ("Ironically, but not unexpectedly, Principal's attorneys suggest[ ] that its underpayment of the claim is the very reason it is not required to pay the full benefits. Neither Dr. Pass nor Dr. Frydman could ever have imagined that Principal would take the absurd position that its own failure to pay excuses its payment of what is owed. Indeed, Principal never made such a ludicrous suggestion in its claim decision."). Here, though, Pass just misses the point: Principal paid the price Frydman had guaranteed—a price that was

11

premised on the dentists' own appraisal of Pass's share of the firm. And, as we're about to explain, because that guaranteed price *is* the Buy-Out Expense, Principal *hasn't* "underpaid."[9]

As for the first requirement—that Frydman actually "incur" the Buy-Out Expense—we agree with Principal that Frydman didn't "incur" any expense beyond $524,623. Any "payment" above that amount was contingent on Frydman's ability to obtain the extra funds from his disability insurers. That extra amount thus wasn't a real liability Frydman was *obligated* to pay. *See* Closing Agreement ¶ 1(d)(2) (voiding any obligation "in excess of the Guaranteed Payments"—*i.e.*, above $524,623—unless Frydman could collect the additional sums from his disability insurers). Under Florida law,[10] then, Frydman didn't "incur" any expense above $524,623 because he wasn't actually liable for anything

---

[9] What, then, do we make of the provision in the Buy-Sell Agreement that allows Pass and Frydman to bump up their purchase price to the "amount of the insurance proceeds[?]" If (one might say) the Policies required Principal to pay the purchase price the accountant computed under the Buy-Sell Agreement, then the dentists could *never* trigger the max-out provision because the proceeds would *always* equal the purchase price—no more, no less. This is a problem (so the argument goes) because we shouldn't impose on the Policies a construction that renders any part of the Buy-Sell-Agreement—which the Policies incorporate by reference—superfluous.

Like Pass's claim that Principal "underpaid," this argument fails because it ignores a salient detail. Recall that the Buy-Sell Agreement required Frydman to buy disability insurance. The two Policies he purchased from Principal—as we've said—determined the amount of the Buy-Out Expense according to the appraisal method set forth in the Buy-Sell Agreement. But Frydman was well within his rights under the Buy-Sell Agreement to go out and buy a different *kind* of disability coverage—or to purchase supplemental insurance—that *guaranteed* a sum-certain if Pass became disabled. In that case, of course, the insurance proceeds may well have exceeded the purchase price. To understand how, imagine that this hypothetical policy guaranteed Frydman—regardless of the firm's valuation—$300,000 in the event of Pass's disability. Imagine, too, that the firm had done poorly in the years before Pass's infirmity—so badly that the value of Pass's appraised share had dipped to $150,000. In this (hypothetical) scenario, the fixed-proceeds policy would nevertheless have entitled Frydman to the full $300,000 of insurance. The point, in short, is that the max-out provision in the Buy-Sell Agreement isn't superfluous because, in the right circumstances, it *could* have been triggered—assuming, of course, that Frydman had bought the right *kind* of policy, which (at least with respect to Principal) he didn't.

[10] Because we're presiding in our diversity jurisdiction, we look to state law to interpret the governing policies. *See, e.g.*, *Hermitage Ins. Co. v. Studio Night Club Corp.*, 2009 WL 103664, at *3 (M.D. Fla. Jan. 15, 2009) ("Because federal jurisdiction over this matter is based on diversity, Florida law governs with respect to the insurance coverage issues in dispute." (citing *State Farm Fire and Cas. Co. v. Steinberg*, 393 F.3d 1226, 1230 (11th Cir. 2004))). And the parties agree that Florida law applies. *See generally* Motion (relying on Florida law); Response (same).

12

more. *See Ceballo v. Citizens Prop. Ins. Corp.*, 967 So. 2d 811, 815 (Fla. 2007) (explaining that the phrase "to incur" an expense "means to become liable for the expense"); *Reliance Mut. Life Ins. Co. of Ill. v. Booher*, 166 So. 2d 222, 224 (Fla. 2nd DCA 1964) (holding that "incurred" meant that "the insured must have actually paid or must have become liable for" the amount); *see also Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005) ("Under Florida law, insurance contracts are construed according to their plain meaning."); BLACK'S LAW DICTIONARY (11th ed. 2019) (defining incur as "[t]o suffer or bring on oneself (a liability or expense)").[11]

On this point, the Eleventh Circuit's decision in *Philadelphia American Life Insurance Co. v. Buckles*, 350 F. App'x 376 (11th Cir. 2009), is instructive. There, a secondary insurer provided a supplemental cancer and disease policy, which covered the "actual charges [the insured] incurred" for medical expenses and required the secondary insurer to reimburse those charges *even if* the primary insurer paid the medical costs directly. *Id.* at 377. The insured was diagnosed with a disease that was covered by the secondary insurance policy, and he received the appropriate treatments. *Id.* at 378. The primary insurer paid for those treatments—but it did so at a reduced price it had separately negotiated with the healthcare provider. *Id.* The provider still sent medical "bills" that reflected the undiscounted charges. *Id.* But, because the provider had already accepted the reduced amounts, neither "[the insured] nor his primary insurer [were] liable for the difference between the reduced amount paid by the primary insurer and the amount actually billed by the hospital." *Id.*

The insured sought to recoup from his insurer the higher amounts reflected in the "bills" he'd received—instead of the discounted price the provider had actually accepted. *Id.* In affirming the district court's ruling in favor of the secondary insurer, the Eleventh Circuit held that the insurance

---

[11] Again, we reject Pass's argument that Frydman's expense was "incurred and real" (rather than "illusory") simply because he alleged this in the Amended Complaint. *See* Response at 13. That's because the appended exhibits—which control us here, *see Celestine*, 741 F. App'x at 713—flatly contradict his claim that Frydman actually "incurred" $880,400 in buy-out expenses.

13

policy—insofar as it covered "actual charges incurred"—was "clear and unambiguous" under Florida law. *Id.* at 379–80 (citing *Reliance*, 166 So. 2d at 224, and *Ceballo*, 967 So. 2d at 815). The policy allowed the insured to collect only the *lower* amount, as that was the amount he'd actually "incurred." *Id.* Our case is just the same: the fact that Frydman and Pass wrote a "purchase price" down on paper doesn't mean that Frydman actually "incurred" that price.

Pass attempts to distinguish *Buckles* by saying that the insured in that case "sought indemnity for an immunotherapy charge that [the insured] was not required to pay" and "that the treatment was less than the amount of coverage." Response at 17. By contrast, Pass insists, the price of his own share of the dental practice was "conclusively" $880,400. *Id.* How else do we explain (he asks) the undisputed fact that, even today, he holds Frydman's note for *that* amount? *Id.* Here, again, Pass misses his mark. By referring to the $880,400 as "conclusive," Pass at once assumes his own premise *and* ignores *Buckles*'s central teaching—*viz.*, that an expense "incurred" must be a *real* obligation or liability. Given this unambiguous holding, Pass's retention of Frydman's promissory note couldn't make the least bit of difference, because Frydman's promise to pay anything above $524,623 is *contingent* on the *availability* of those insurance proceeds. *See* Closing Agreement ¶ 2(b)(2) (requiring Frydman to "execute a note" for the purchase price and providing that the note "shall be subject to paragraph 1(d) above such that payments in excess of $524,623 shall be suspended if any of the Policies do not pay benefits").[12]

---

[12] Pass seems to concede (as he must) that the price in the note *can be* voided if Frydman doesn't collect the extra money from the insurers. *See* Response at 17–18. Still, he insists that the note *hasn't* been voided. *Id.* But that's beside the point. The Closing Agreement allows Frydman to void any amount above $524,623 if the parties cannot collect from the insurers, *through litigation* or otherwise. *See* Closing Agreement ¶ 1(d)(2) ("If Dr. Pass and/or Dr. Frydman are unable to collect benefits under the Policies, through litigation or otherwise, exceeding the Guaranteed Payments, then Dr. Frydman's tender under subparagraph (1) above shall be voided and Dr. Pass shall not collect any further payments from Dr. Frydman in excess of the Guaranteed Payments."). And so, although it's technically true that the full purchase price in the note hasn't been voided *yet*, it certainly will be as soon as we grant final judgment for Principal.

14

Pass relies on two other cases—neither applicable here. He cites *Lincoln Dental Arts Clinic Ltd. v. Mutual Life Insurance Co. of New York*, 1993 WL 239020 (N.D. Ill. June 28, 1993), for the proposition that an "incurred" expense doesn't require an "out-of-pocket" payment. *See* Response at 17. But *Lincoln Dental* involved a different issue. There, a dentist owned a disability policy that covered his overhead expenses during any period of disability. *See Lincoln Dental*, 1993 WL 239020, at *2. The insurer agreed that the dentist had become disabled and that the other conditions precedent in the policy had occurred. *Id.* But the insurer argued that the dentist didn't "incur" any overhead costs because the firm (not the dentist) had paid those expenses. *Id.*

In siding with the dentist, the court looked to the plain terms of the policy, which defined "covered overhead expenses" as *the firm's* overhead multiplied by the dentist's interest in the company. *Id.* at *3 (quoting the policy, which provided that the insurer "will consider as Covered Overhead Expenses *incurred* by you a percentage of *the corporation's* total Covered Overhead Expenses." (emphases added)). In other words, the policy simply accounted for the practical reality that a proprietor rarely pays his firm's overhead expenses out of his *own* pocket. *Id.* at *4 (explaining that the policy "implicitly contemplate[d] that all of the shareholder's expenses, in a solvent corporation, will be paid by the corporation itself . . . Therefore, 'incur' cannot require an out of pocket payment by the shareholder."). Nonetheless, because the proprietor owns a part of the corporation, the firm's overhead costs remain a "real" financial obligation *for him* to the extent they cut into the firm's profits. Here, by contrast, Frydman didn't "incur" any real financial *liability*—at least not above the guaranteed payment of $524,623—because it's undisputed that neither he nor the firm will be obligated to pay that extra amount. Under Florida law, then, Frydman didn't "incur" that added amount as an expense. *See Buckles*, 350 F. App'x at 379–80 (explaining that, under Florida law, the phrase "to incur" an expense "means to become liable for the expense").

15

Pass also cites *Hann v. Paul Revere Life Insurance Co.*, 2008 WL 3286977, at *2 (N.D. Ill. Aug. 8, 2008), for the view that "[t]here are some policies that require actual payment of the buy-out expense before reimbursement." Response at 17. His Policies are different, as he rightly points out, because they only required that the expenses be "incurred," not paid. *Id.* And, he insists, "a negotiated instrument satisfies that requirement." *Id.* But this distinction between paying an expense and incurring it is really irrelevant for our purposes. It's true that the Policies didn't require Frydman to *pay* the buy-out expense *before* seeking reimbursement from Principal. But that doesn't mean that Frydman was free to scribble any amount into a negotiable instrument and—*voilà*—magically convert that amount into an expense he "incurred." Again, the only expense Frydman "incurred" was the $524,623 he's obligated to pay Pass. Every cent above that is an illusory expense that Frydman will never actually have to pay—and which he thus will never "incur."

Two final observations. *First*, we agree with Principal that the Policies' reporting obligations would make little sense if Pass and Frydman could arrive at their own arbitrary price and then use that price to set the Buy-Out Expense. *See* Motion at 13. The Policies unambiguously envisioned that, before paying anything, Principal would have the chance to evaluate the owner's *actual* loss, including by double-checking the method and substance of the firm's appraisal. *See* Policy 1 at 6 (requiring the owner to provide Principal with (1) the Buy-Sell Agreement, (2) the Buy-Out Expense the owner "actually incur[red]," and (3) the method the owner used to value the firm); Policy 2 at 9 (requiring the owner to send Principal "satisfactory written proof of loss," which includes "[c]opies of the Buy-Sell Agreement[,] and business valuation documents," as well as other financial documents and any additional proof Principal deemed necessary). This policy language undermines Pass's suggestion that he and Frydman retained unfettered discretion to set their own purchase price. *See* Response at 2 ("Under the policies, the shareholders are given the discretion to value their shares as they see fit."). Why, after all, would the insurance company require Frydman to provide these documents—why,

16

indeed, would it care a lick about the valuation methodology—if it was obligated to pay the policy limits *no matter what*? The fact is it wouldn't. Which is why, in the end, the kind of discretion Pass here demands—the kind he says the Policies afforded—wouldn't comport with *either* the text *or* the structure of the Policies. *Cf. Senco of Fla., Inc. v. Cont'l Cas. Co.*, 440 So. 2d 625, 626 (Fla. 2d DCA 1983) ("Insurance policies should be construed to provide a reasonable, practical, and sensible interpretation consistent with the intent of the parties.").

Pass responds by pointing out that the Policies *didn't* tie the Buy-Out Expense to the firm's market value or impose on the insured any particular method of valuation. *See* Response at 1–2. But that's not the same as saying that Pass and Frydman had complete discretion to set their own purchase price. To the contrary, the Policies mandated that an owner incur the Buy-Out Expense according to the terms of a Buy-Sell Agreement. *See* Policy 1 at 4 (defining the "Buy-Out Expense" as "the expense incurred by the Owner *in performance of the terms of the Buy-Sell Agreement*" (emphasis added)); Policy 2 at 4 (same). As we've explained, the Buy-Sell Agreement directed Pass and Frydman to determine the purchase price of their counterpart's share of the firm. The result of that calculation—as set forth in Paragraph 9D of the Buy-Sell Agreement—could be adjusted only when the insurance *proceeds* exceeded the appraised value. *See* Buy-Sell Agreement ¶ 9D. Since Pass and Frydman adjusted the price based on the maximum *coverage* amount, their adjustment wasn't "in performance of the terms of the Buy-Sell Agreement." That price increase, in short, wasn't part of Frydman's Buy-Out Expense.

*Second*, Pass's view that the Policies allowed him and Frydman to set the purchase price as "they [saw] fit"—that is, up to the maximum amount of insurance coverage—doesn't make sense given the policy provisions that determined the *manner* of Principal's reimbursement. According to the Policies, the lump sum to the owner would be "equal to the *lesser* of the actual lump sum Buy-Out Expense the Owner incurred *or* the Maximum Lump Sum Benefit shown on the current Data Page," and "[t]he total of the lump sum benefit will not exceed the lesser of the total Buy-Out Expense or

17

the Maximum Aggregate Benefit." Policy 1 at 6 (emphases added); Policy 2 at 6 (same). In other words, the Policies differentiated between the *real* Buy-Out Expense and the maximum amount of disability coverage. It's possible, of course, that (in some cases) the owner's Buy-Out Expense will be greater than (or equal to) the coverage maximum—just as, in other cases, the Buy-Out Expense will be less. So, if the policy owners could always max out their policies, then they always would, and there wouldn't have been any reason for the Policies to distinguish between the actual expense and the maximum amount of coverage. This point dovetails nicely with Principal's contention that Pass's interpretation of the Policies would yield an "absurd" result—one that would allow Pass and Frydman to benefit from an unintended windfall. *See* Motion at 6. We agree. Frydman hasn't incurred any expense above $524,623, and it would be absurd to interpret the Policies as allowing him to collect more than that amount simply because he and Pass (understandably) pinned their price to the policy limits. *See Buckles*, 350 F. App'x at 380 (explaining that it would be absurd to construe an insurance policy in such a way as to give the insured "a benefit based on a fictional amount").

\*\*\*

After careful review, we hereby **ORDER AND ADJUDGE** as follows:

1. Principal's Amended Motion for Judgment on the Pleadings [ECF No. 27] is **GRANTED**.

2. The Plaintiff's Motion for Summary Judgment [ECF No. 34] is **DENIED as moot**.

3. Pursuant to FED. R. CIV. P. 58, final judgment will be entered separately.

4. The Clerk of Court shall **CLOSE** this case.

5. All other pending motions are **DENIED as moot**, all other deadlines are **TERMINATED**, and any remaining hearings are **CANCELED**.

**DONE AND ORDERED** in Miami, Florida, this 15th day of September 2021.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:   counsel of record